# UNITED STATES DISTRICT COURT
for the
Middle District of North Carolina

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

AN HTC CELLPHONE MODEL OPM92 THAT IS ASSIGNED TO THE PHONE NUMBER 1-704-267-6173 AND THAT IS IN THE POSSESSION OF THE FEDERAL BUREAU OF INVESTIGATION

)
)
)
)
)
)

Case No. 1:16 MJ 322

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A.

located in the _____Middle_____ District of _____North Carolina_____, there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 924(b) | Interstate Transportation of Firearms with Intent to Commit Offenses, or with Knowledge or Reasonable Cause to Believe that Offenses Will be Committed |

The application is based on these facts:

Please see the attached affidavit.

☑ Continued on the attached sheet.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI Special Agent Tara S. Cataldo
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ____12/14/2016____

City and state: _____

_____
*Judge's signature*

L. Patrick Auld, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF AN HTC CELLPHONE MODEL OPM92 THAT IS ASSIGNED TO THE PHONE NUMBER 1-704-267-6173 AND THAT IS IN THE POSSESSION OF THE FEDERAL BUREAU OF INVESTIGATION | Case No. 1:16mj322 |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Tara Cataldo, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search AN HTC CELLPHONE MODEL OPM92 THAT IS ASSIGNED TO THE PHONE NUMBER 1-704-267-6173 AND THAT IS IN THE POSSESSION OF THE FEDERAL BUREAU OF INVESTIGATION (the "TARGET PHONE"), which is further described in Attachment A, for the things described in Attachment B.

2. I am a Special Agent of the Federal Bureau of Investigation ("FBI"), and have been since March of 2008. My initial training consisted of a twenty week FBI new agent course during which I received instruction on various aspects of federal investigations, ranging from economic espionage and child pornography, to kidnapping and computer intrusions. In addition, I have received more than 350 hours of training related to computers and cyber matters, to include investigations of cybercrime. I am currently assigned to the Charlotte Division and stationed at the Greensboro Resident Agency. Prior to joining the FBI, I worked in law

enforcement for over eight years as a police officer and sheriff's investigator. I have been the case agent or supporting agent in numerous investigations, including investigations involving violent crimes and federal firearms charges. Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. §§ 371 and 924(b) and other violations of Title 18 of the United States Code. In this context, I am authorized by the Attorney General to request a search warrant.

3. The information in this affidavit is based on my personal knowledge as well as the accounts of investigating FBI agents, as well as other law enforcement officers.

4. This affidavit is intended to show that there is sufficient probable cause for the requested warrant. It neither sets forth all of my knowledge about this matter, nor describes every fact known to the government in connection with this investigation.

## **PROBABLE CAUSE**

### Overview

5. On December 4, 2016, at approximately 3:00 p.m., an individual who later identified himself as Edgar Maddison Welch ("WELCH") walked into the "Comet Ping Pong" restaurant at 5037 Connecticut Avenue, N.W., Washington, D.C. WELCH was armed, displaying a loaded AR-15 assault rifle and carrying a loaded .38 caliber revolver. The restaurant was open and occupied by both employees and customers, including children.

6. WELCH entered the restaurant carrying the AR-15 across his chest, in a manner that instilled fear in everyone who saw him. As WELCH moved towards the back of the restaurant, customers and employees fled the building, fearing for their lives. While WELCH was inside the restaurant, he fired the AR-15 multiple times. Shortly after that, when an unaware

employee walked through a rear door into the restaurant, WELCH turned towards the employee, such that his rifle was pointed in the direction of the employee, who immediately fled in fear.

7. As set forth further below, I respectfully submit that there is probable cause to believe that, on December 4, 2016, WELCH transported the above-listed firearms (as well as an additional shotgun) across state lines, from North Carolina to Washington, D.C., with intent to commit the offenses listed above. As set forth below, WELCH appears to have been motivated, in part, by unfounded rumors concerning a child sex-trafficking ring that was being perpetrated by high-profile individuals at the Comet Ping Pong restaurant. According to evidence obtained from his cellphone, it appears that WELCH had been contemplating a violent confrontation at the restaurant since at least December 1, 2016. The evidence from WELCH's cellphone also indicates that WELCH attempted to recruit at least two other people to join him.

8. I further submit, respectfully, that there is probable cause to search the TARGET PHONE, which is further described in Attachment A, for the evidence described in Attachment B.

## Evidence Recovered From Welch's Phone

9. During a voluntary, post-arrest interview on December 4, 2016, WELCH told MPD officers that he had left his cellphone inside his Toyota Prius, which had been parked outside the Comet Ping Pong restaurant. The following electronic evidence was seized from

WELCH's cellphone, after officers obtained warrants to search WELCH's vehicle and cellphone.[1]

10. On December 1, 2016, while using his cellphone to visit a number of YouTube pages, WELCH sent a text message to his girlfriend, "M.R." WELCH indicated that he had been researching "Pizzagate" and that it was making him "sick." "Pizzagate" is a term commonly used to refer to the above-described rumors about a sex-trafficking ring at Comet Ping Pong.

11. During the next few hours after sending that text message, WELCH continued viewing YouTube pages on his cellphone. He also visited the Comet Ping Pong website.

12. Shortly after 8:00 p.m. on December 1, 2016, WELCH sent a text message to the phone number of the TARGET PHONE, which is owned by a friend named "B.". The text message to the TARGET PHONE included an internet link to a YouTube video. The text message also included the note, "Watch PIZZAGATE: The Bigger Picture on YouTube."

13. A few minutes later, WELCH received a phone call from a cellphone owned by a friend referred to here as "C." It is not clear whether or not WELCH actually spoke with C., but a few minutes after the phone call, WELCH and C. exchanged text messages. At about 8:28 p.m., C. texted WELCH, "Tell me we r going to save the Indians from the pipeline." WELCH responded, "Way more important, much higher stakes" and "Pizzagate." C. wrote, "Sounds like we r freeing some oppressed pizza from the hands of an evil pizza joint." WELCH replied, "Youtube tonight, talk in AM." At about 8:35 p.m., C. texted WELCH, "I'm in."

---

[1] The electronic evidence gathered from the cellphone is consistent with WELCH's ownership and use of the phone. This evidence includes text messages to and from the cellphone, user account data included within the phone, and pictures and videos recovered from the phone.

14. A few minutes later, WELCH sent a text message to B., asking B. to contact him so that they could drive together to C.'s residence in the morning. WELCH also asked B. to spend some time on YouTube before then. B. said he would contact WELCH in the morning.

15. On December 2, 2016, at about 2:58 p.m., WELCH texted C., asking whether C. wanted to meet, and whether C. had any Army buddies nearby. When C. indicated that he had one, WELCH asked, "he down for the cause?" C. said that it depended on the cause. WELCH responded: "Raiding a pedo ring, possibly sacraficing [sic] the lives of a few for the lives of many. Standing up against a corrupt system that kidnaps, tortures and rapes babies and children in our own backyard... defending the next generation of kids, our kids, from ever having to experience this kind of evil themselves[.] I'm sorry bro, but I'm tired of turning the channel and hoping someone does something and being thankful it's not my family. One day it will be our families. The world is too afraid to act and I'm too stubborn not to[.]"

16. C. asked WELCH to call him, and they exchanged phone calls a few minutes later. A few minutes after that, WELCH texted M.R. that he was going to C.'s residence. B. also sent WELCH a text message indicated that he, too, would come to C.'s residence.

17. On December 4, 2016, at about 6:42 a.m., B. texted WELCH, asking WELCH to meet. After coordinating about the location, WELCH texted that he was "otw," or on the way. B. responded at about 6:52 a.m., "Hell moths Fucking yeq [sic]."

18. On December 4, 2016, at about 8:42 a.m., M.R. and WELCH began exchanging text messages which indicated that WELCH had left home while M.R. was sleeping, leaving his children alone with M.R. (who is not a parent of the children). M.R.'s text messages became increasingly concerned as the day progressed.

19. WELCH's phone also contained a video recording with the time stamp of 11:06 a.m. on December 4, 2016. The video appears to have been recorded while WELCH was driving. The phone camera was aimed at WELCH, who looked into the camera and told family members that he loved them; that he hoped that he had "showed it"; and that he hoped that he would be able to "tell [them] again." "And if not," he told them "don't ever forget it."

<u>Offense Conduct in Washington, D.C.</u>

20. A few hours later, at about 3:00 p.m. on December 4, 2016, WELCH arrived at the Comet Ping Pong restaurant. Witnesses saw WELCH enter the front door of the restaurant, carrying an assault rifle that he was holding across his chest, such that anyone who looked at WELCH would see the gun. Witnesses saw WELCH moved towards the rear of the restaurant with the gun, but WELCH did not interfere with the employees and customers who – fearing for their lives – fled the building.

21. At about the time that everyone else was running away from WELCH, restaurant employee CW-1 was retrieving dough from a freezer in an alley behind the restaurant. While CW-1 was outside by the freezer, CW-1 heard three loud bangs. Although CW-1 has stated that these loud noises were consistent with the sound of gunfire, at the time CW-1 did not know what caused them. As such, CW-1 returned the restaurant as he had intended.

22. When CW-1 entered the restaurant, CW-1 encountered WELCH and saw that WELCH was carrying a rifle. CW-1 could see that WELCH saw CW-1. WELCH then turned with the AR-15 rifle such that it was pointing in the direction of CW-1. CW-1, fearing for his life, immediately fled the restaurant. CW-1 ultimately found MPD officers who had responded to the scene. CW-1 reported to the officers what had occurred inside the restaurant.

23. When the first-responding police officers initially approached the restaurant, they encountered customers fleeing the restaurant through the main entrance. Officers observed multiple witnesses fleeing, and asked whether there were any additional customers inside the restaurant. One of the witnesses indicated that all of the customers had fled.

24. The responding police officers created a perimeter around the restaurant, stopping traffic and escorting witnesses to a nearby firehouse for safety. At approximately 3:24 p.m., WELCH exited the front of the restaurant with his hands up in the air. Officers directed WELCH to keep his hands up in the air, walk backwards away from the restaurant, and expose his waistband (so that officers could determine whether WELCH was currently armed). WELCH complied with these instructions, and then complied with further instructions to lay on the ground. Officers then placed WELCH in handcuffs. An officer asked whether WELCH had any weapons, and asked WELCH to describe their location. At that time, WELCH told officers that he had an AR-15 and a .38 caliber revolver, and that both weapons were inside the restaurant.

25. An officer then asked why WELCH had entered the restaurant armed. WELCH asserted that he had read internet "news" reports that Comet Ping Pong was harboring child sex slaves. WELCH further claimed that he had come to the restaurant to investigate those reports, and that he had come armed so that he could rescue the alleged victims.

26. Officers conducted two show-up identification procedures with witnesses who had seen the armed man inside the restaurant. Both witnesses identified WELCH as the armed man that they had seen inside the restaurant.

27. After WELCH was detained, MPD officers entered and searched the restaurant. During the search of the restaurant, officers recovered an AR-15 (which was loaded with one round of ammunition in the chamber and twenty-two rounds in the magazine) as well as a .38 caliber six-shot revolver (which was with six rounds in the cylinder). Officers also recovered spent shell casings and observed other physical evidence that was consistent with the audible evidence that WELCH had discharged a firearm multiple times inside the restaurant.

### Statements by Welch

28. WELCH was arrested and taken to the Second District for processing. WELCH identified himself as Edgar Maddison Welch, of Salisbury, North Carolina.

29. WELCH was advised of his right to remain silent under *Miranda v. Arizona*. WELCH acknowledged that he understood his right to remain silent and to counsel. WELCH then voluntarily waived his right to remain silent and provided a statement.

30. WELCH stated that he had learned about "news" reports concerning a child sex trafficking ring that was being conducted in hidden rooms at the Comet Ping Pong restaurant, which allegedly involved high-profile individuals. WELCH said that he had read these reports on the internet, heard about the reports from other people, and heard about them on the radio. WELCH claimed that he had decided to "investigate" these reports on his own. WELCH said that this was why he had decided to visit the Comet Ping Pong restaurant.

31. WELCH said that, for that reason, he got into his car at approximately 9:00 a.m. that morning and drove from his home in North Carolina, straight to the Comet Ping Pong restaurant in Washington, D.C. WELCH said that, while he was driving from North Carolina to the Comet Ping Pong restaurant, he used his cell phone to communicate with family members

about his travel to Washington, D.C. WELCH said that, while he was driving, he told his girlfriend words to the effect that he "might be gone awhile."

32. WELCH said that he parked his car outside the restaurant and walked towards the entrance. WELCH said that he entered the restaurant armed, carrying an assault rifle, and said that he also had a .38 revolver in a holster on his hip. WELCH said that he entered the restaurant with the rifle openly displayed and pointed downwards. WELCH stated that, while he was in the restaurant, he searched for evidence of hidden rooms or tunnels, or child sex trafficking of any kind. WELCH stated that, at one point, he encountered a locked door. When he was unable to open the door, WELCH became suspicious and attempted to force it open with a butter knife, and then by shooting the lock. WELCH said that he fired shots at the lock using his AR-15. WELCH said that, when that also proved unsuccessful, he climbed furniture to look into the closed-off room, and found that it was unoccupied. WELCH also described encountering an employee who entered from the rear of the restaurant, consistent with CW-1. WELCH admitted turning towards the employee with the "AR" in his hands. When asked, WELCH denied raising the AR-15 at the employee.

33. WELCH claimed that, after he found no evidence of child sex trafficking, he exited the restaurant and surrendered himself to police officers that were already on-scene.

34. WELCH admitted to having an additional loaded shotgun in his vehicle, as well as ammunition. MPD officers later obtained a search warrant to search WELCH's vehicle, which is a Toyota Prius bearing North Carolina license plates. When that warrant was executed on December 5, 2016, law enforcement technicians recovered the above-mentioned shotgun

(which was loaded with four live rounds of ammunition) from the rear hatchback area of the vehicle, together with a box containing fourteen additional rounds of ammunition.

## Conclusion As To The Offense Conduct

35. Based on the foregoing, I respectfully submit that there is probable cause to believe that WELCH has committed the offense of Transporting a Firearm with Intent to Commit an Offense or with Knowledge or Reasonable Cause to Believe that an Offense Would be Committed, in violation of 18 U.S.C. § 924(b), in that WELCH transported, across state lines from North Carolina to the District of Columbia, multiple loaded firearms, with intent to commit offenses that are punishable by more than one year in prison under the law of the District of Columbia, or with knowledge or reasonable cause to believe that such offenses would be committed, including violations of 22 D.C. Code § 402 (Assault with a Dangerous Weapon), 22 D.C. Code § 4504(a) (Carrying a Pistol Without a License), and 22 D.C. Code 4504(a-1) (Carrying a Rifle or Shotgun). I further submit that there is probable cause to believe that, upon arrival in the District of Columbia, WELCH did commit the above-listed D.C. Code offenses.

## **THE TARGET PHONE**

36. On December 12, 2016, I called the TARGET PHONE, and the individual who answered the phone identified himself as B. On that same date, myself and Detective C. Gordy of the Rowan County Sheriff's Office interviewed B. in person at his home. During the course of the interview, B. confirmed that he used his cellular phone to communicate with WELCH. I asked B. for consent to search his cellular phone, but he refused. While we were speaking, Detective C. Gordy called the TARGET PHONE; the phone rang in B.'s front pocket. B. retrieved the phone from his pocket and silenced the phone. I then employed a ruse to convince

B. to use the TARGET PHONE to make a call. During the call, B. handed the phone to me, at which point I seized the phone. B. subsequently provided consent to search the phone and B. signed a receipt for the phone as well as a Consent to Search form. B. also provided the passcode for the phone during the interview.

37.   I seized the TARGET PHONE based, first, on my belief that there was probable cause to believe that the TARGET PHONE contained evidence of communications between B. and WELCH, particularly that evidence set forth in Attachment B. During the interview, B. had acknowledged that the used his cellphone to communicate with WELCH; the evidence on WELCH's cellphone showed that WELCH sent relevant messages to B.; and the phone that we seized rang when law enforcement dialed the phone number of the TARGET PHOHE. I also seized the TARGET PHONE based on my belief that seizure was necessary to ensure preservation of the evidence on the TARGET PHONE. Based on my training any experience, anyone with physical possession of a cellphone can delete much or all of the electronically-stored contents of the cellphone, even without otherwise physically damaging the cellphone.

38.   After I seized the TARGET PHONE, I did not search it for content. I accessed the phone to turn on its "airplane mode," which would prevent the phone from accessing wireless networks, and I turned off the passcode function of the TARGET PHONE. I knew that a search warrant was already being drafted for the TARGET PHONE and, based on my training and experience, these steps were necessary to ensure that individuals could not remotely destroy the contents of the TARGET PHONE, and to preserve law enforcement's ability to access the TARGET PHONE after obtaining a search warrant. If the TARGET PHONE was able to access

wireless networks, individuals with the appropriate technical skills could access the TARGET PHONE and "wipe it," or delete its contents.

39. Based on the foregoing, I respectfully submit that there is probable cause to believe that the TARGET PHONE will contain evidence of the above-described offenses. According to the evidence recovered from WELCH's phone, between at least December 1, 2016, and December 4, 2016, the TARGET PHONE was used to communicate with WELCH about WELCH's motives and plans concerning "Pizzagate." Moreover, as set forth above, it appears that WELCH, B., and C., all met together to discuss WELCH's plans. Thus, it is likely that, in addition to the communications between WELCH and the TARGET PHONE, the TARGET PHONE will also contain evidence of communications between the B. and C. Finally, given the dramatic nature of the events of December 4, 2016, and the fact that said events have received national news coverage, it seems likely that the TARGET PHONE may also contain evidence of concerning WELCH's conduct.

## TECHNICAL BACKGROUND

40. The TARGET PHONE is a cellphone which is capable of sending and receiving text messages. Based on my experience with the current state of technology for cellphones, as well as the fact that WELCH sent text messages containing internet (e.g., YouTube) links, it is also likely that the TARGET PHONE is a smartphone.

41. Based on my training and experience, I know that it is common for people to consume news and social media using smartphones such as the DEVICE, including the YouTube link that WELCH sent to the TARGET PHONE. I also know that smartphones such as the TARGET PHONE commonly retain evidence concerning the user's internet browsing history

and social media history, as well as evidence of other relevant communications, such as text messages or other messages that can be used to distribute news stories.

42. Based on my training, experience, and research, I know that a cellphone, such as the TARGET PHONE, can be used for voice and data communication through radio signals. Such cellphones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A cellphone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, cellphones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet, through web browsers, social media applications, and other methods. Cellphones may also include global positioning system ("GPS") technology for determining the location of the device, and many cellphones include word processing programs and other applications that, historically, have been associated with desktop or laptop computers.

43. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, the content of communications between the owner and others, information about the web browsing and social media use of the owner, and a vast majority of other information concerning the movements, intentions, plans and knowledge of the cellphone owner and those that they communicate with.

44. Moreover, based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

45. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the TARGET PHONE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the TARGET PHONE because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review

team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

46. Based on the foregoing, the warrant I am applying for would permit the seizure of the TARGET PHONE described in Attachment A, and the examination of the TARGET PHONE, consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the TARGET PHONE to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

47. I submit that this affidavit supports probable cause for a warrant to search the TARGET PHONE described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

_____
Tara S. Cataldo
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on December 14, 2016:

_____
HONORABLE L. PATRICK AULD
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A

*Property to be Seized and Searched*

The property to be searched is an HTC cellphone, Model OPM92, which is assigned the phone number 1-704-267-6173, and which is in the possession of the Federal Bureau of Investigation.

# ATTACHMENT B

*Property to be seized*

1. This warrant authorizes the seizure and search of the cellphone described by Attachment A (the "TARGET PHONE").

2. This warrant authorizes the seizure and search of the contents of the TARGET PHONE, for the records and information described below:

   (a) For the period between November 30, 2016, and December 12, 2016, any and all communications between the cellphone and Edgar Maddison Welch ("WELCH");

   (b) For the period between November 30, 2016, and December 12, 2016, any and all communications between the cellphone and any phone with the number 1-704-232-5986;

   (c) For the period between November 30, 2016, and December 12, 2016, any and all communications, records or information concerning "Pizzagate"; and

   (d) For the period between November 30, 2016, and December 12, 2016, any and all communications, records, or information concerning WELCH;

   (e) For the period between November 30, 2016, and December 12, 2016, records and information concerning WELCH's motives and intent in traveling to the Comet Ping Pong restaurant on or about December 4, 2016, and in entering the restaurant while carrying firearms;

(f) For the period between November 30, 2016, and December 12, 2016, records and information concerning any communications that WELCH may have had about his intentions in traveling to the Comet Ping Pong restaurant, and in entering the restaurant while carrying firearms;

(g) records and information concerning WELCH's mental state in connection with traveling to the Comet Ping Pong restaurant, and in entering the restaurant while carrying firearms; and

(h) records and information concerning WELCH's travel, planning and preparation for traveling to the Comet Ping Pong restaurant, and in entering the restaurant while carrying firearms.